1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11  CENTER FOR BIOLOGICAL                    No.  2:15-cv-01627-TLN-CMK
    DIVERSITY, and EARTH ISLAND
12  INSTITUTE,

13              Plaintiffs,                   **ORDER DENYING MOTION FOR
                                             INJUNCTIVE RELIEF**
14         v.

15  DAVE HAYS, Lassen National Forest
    Supervisor, and UNITED STATES
16  FOREST SERVICE,

17              Defendants.

18

19         This matter is before the Court pursuant to Plaintiffs Center for Biological Diversity and

20  Earth Island Institute's ("Plaintiffs") motion for temporary restraining order and/or preliminary

21  injunction.  (ECF No. 10.)   Federal Defendants Dave Hays and the United States Forest Service

22  oppose Plaintiffs' motion, (ECF No. 13), and Plaintiffs have filed a reply (ECF No. 14).  The

23  Court has carefully considered the arguments raised by both parties' briefing.  For the reasons

24  stated below, Plaintiffs' motion for temporary restraining order and/or preliminary injunction

25  (ECF No. 10) is DENIED.[1]

26  _____
    [1]       In conjunction with these motions, both parties have filed motions to strike.  Defendants move to strike
27  paragraphs 12–16 from the Declaration of Chad Hanson because they contain post-decisional, extra-record evidence.
    (ECF No. 12.)  The Court agrees and hereby GRANTS Defendant's motion.
28          Additionally, Plaintiffs move the Court to strike portions of the Declaration of Russell Hays ("Hays") filed
    with Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.  (ECF No. 17.)  Plaintiffs contend

                                             1

# I.   FACTUAL BACKGROUND

This matter concerns a fire salvage restoration project ("the Project") that was proposed and approved by the U.S. Forest Service ("the Service").[2]  Specifically, Plaintiffs seek to enjoin Defendants form carrying out the Project on acres that have been identified as the black-backed woodpecker's ("BBWP") habitat.

The Bald Fire was started by lightning on July 30, 2014, and burned 39,832 acres of land on and near the Lassen National Forest ("Forest") before being controlled on September 15.  (EA 2.)  In total, there are 31,324 burned acres in the Forest.  (DN 1.)  The purposes of the Project are to reduce safety hazards, capture the remaining economic value of the dead trees, reduce fuel loads and the potential for devastating re-burns, and restore a forested landscape.  (EA 4.)

The Project proposes to improve human safety through felling or removing fire-killed hazard trees along 131 miles of roads, which are open to the public and provide access to private land, as well as along the Burlington Northern Santa Fe railroad.  (DN 7.)  As standing dead trees ("snags") age, they become less stable and hazardous to Forest users.  (EA 28.)  The trees threaten the safety of visitors and limit future firefighter access and therefore must be removed.

---

that: (1) paragraph 3 should be stricken because it "makes legal argument as to the purpose of National Forests"; (2) paragraphs 7, 8, and 25 through 32 should be stricken because they contain information that "should have been presented in [Defendants'] brief" and because Hays "makes conclusions about the woodpecker he is not qualified to make"; and (3) that paragraphs 15, 16, and 19 should be stricken because they contain unspecified "conclusions that Supervisor Hays is not qualified to make. . ."  (ECF No. 17 at 3–4.)  The Court finds as follows: Plaintiffs' motion to strike paragraph 3 is DENIED. As the Supervisor for the Forest, Hays is responsible for managing the Forest in accordance with the Lassen National Land and Resource Management Plan ("Forest Plan"), which is promulgated pursuant to the National Forest Management Act ("NFMA").  (ECF No. 13-1 ¶ 3.)  NFMA requires the Forest Service to maintain "appropriate forest cover with species of trees, degree of stocking, rate of growth, and conditions of stand designed to secure the maximum benefits of multiple-use sustained yield management in accordance with land management plans."  16 U.S.C. § 1601(d)(1).  In paragraph 3 of the declaration, Hays notes the relevant statutory provision, and indicates that the Forest Plan provides direction for reestablishing forested conditions following wildfires. (ECF No. 13-1 ¶ 3.)  The Court does not agree with Plaintiffs' contention that this is an improper legal argument.  As to Plaintiffs' arguments concerning paragraphs 7, 8, and 25–32, the Court finds that these paragraphs contain explanations of the proposed plan which are appropriate.  *See Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1165 (9th Cir. 1998) ("the Ninth Circuit has adopted the more 'enlightened' approach which permits 'explanation' of agency decision-making" so as to provide a "satisfactory explanation of agency action [which] is essential for adequate judicial review.'") (quoting *Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984)).  Finally as to Plaintiffs' argument concerning paragraphs 15, 16, and 19, the Court finds that these paragraphs are permissible under Local Rule 231, because they speak to whether the balance of harms weighs in favor of granting or denying injunctive relief.  Accordingly, Plaintiffs' Motion to Strike (ECF No. 17) is DENIED.

[2]       The administrative record ("AR") for the Bald Fire Salvage and Restoration Treatment Project ("Project") was lodged with the Court on August 5, 2015.  (ECF No. 8.)  Throughout this Court's Order, the Decision Notice and Finding of No Significant Impact (AR 03–20) is referenced as "DN" and the Environmental Assessment (AR 21–99) as "EA" followed by the page number on the original document.  All other documents are cited as "AR" followed by the Bates-numbered page.

1    (DN 7.)  The proposed salvage harvest will allow the Service to recover a significant economic

2    benefit from fire-killed trees, providing 39.3 million board-feet of merchantable timber worth

3    approximately $982,500, and improving the local economy.  (AR 273.)  However, the volume of

4    timber is quickly diminishing as insects, fungi, and weather hasten the decay of the fire-killed

5    trees.  (AR 120–21.)  The Project proposes to reduce excess fuels, reducing the potential for

6    catastrophic fire in the future while protecting seedlings and saplings, which are at high risk from

7    wildfire.  (EA 25.)  Within each salvage and fuels reduction treatment unit, 20 percent of the area

8    is designated as a wildlife retention island and left untouched for use by wildlife that prefer

9    burned habitat.  (EA 46.)  Using native conifer seedlings, the Project also proposes reforesting

10   more than 12,000 acres, to speed the recovery of habitat for forest dependent wildlife species.

11   (DN 8.)  Absent reforestation, large patches of moderately-high and high severity burned areas

12   would shift toward a shrub-dominated landscape for several decades.  (EA at 6–7.)

13           Proposed salvage harvest will take place on 8,447 acres (27%) and fuels reduction will

14   take place on 5,499 acres (18%) of Forest land within the fire perimeter.  (DN 9.)  The Project

15   areas were chosen in order to retain the unique habitat created by the fire as part of the landscape.

16   Some of the areas will be planted and become reforested quickly while other areas will not be

17   planted and will instead progress through a succession starting as brush fields then becoming

18   forested.  (DN 9.)  In this way, the Project promotes a mosaic of habitat types to move the area

19   toward structural heterogeneity more quickly.  (DN 9.)

20           The Decision Notice found that the short term benefits of the Project are better human

21   safety and reduced risk of high-intensity fire, (DN 2, 13), and that the long term benefits are the

22   faster reestablishment of fire-resistant, shade-intolerant conifer habitat for forest-dependent

23   wildlife species, (DN 13).

24           As a result of the fire, approximately 5,769 acres of medium and large diameter burned

25   snag ecosystem currently exists on the Forest portion of the fire area.  (EA 45.)  Burned forest is

26   the preferred habitat of the BBWP, (AR 355), although the species is also found at lower densities

27   on unburned forests throughout the Sierra Nevada.  (AR 3113, 3189.)  While there is some

28   evidence that BBWP disperse over long distances, dispersal distances are not fully understood.

1    (AR 3122.)

2          BBWP are primary cavity excavators, creating holes in trees – usually snags – in which to

3    lay their eggs and raise their young.  (AR 337.)  They forage on the larvae of wood-boring

4    beetles, engraver beetles, and mountain pine beetles that are found in the trunks of burned

5    conifers.  (AR 339.)  BBWP are distributed in boreal regions from south-central Alaska across

6    Canada to Newfoundland and Nova Scotia, and in the western United States in Montana,

7    Washington, and east-central California.  (AR 337.)

8          Plaintiffs petitioned the California Fish and Game Commission to list BBWP as

9    threatened or endangered, but the agency determined such designation was not warranted.  (AR

10   336–37.)  The International Union for the Conservation of Nature (IUCN) evaluated the BBWP in

11   2012, and determined that it was a species of "Least Concern" due to its "extremely large range,"

12   stable population, and "extremely large" population size.  (AR 337.)

13         The Service analyzed the Project's impact on BBWP in the Project Environmental

14   Assessment (EA).  The Management Indicator Species Report ("MIS Report") (AR 486–512) and

15   Supplemental Black-Backed Woodpecker Assessment ("Assessment") (AR 334–60), both

16   incorporated by reference to the EA, specifically address impacts on BBWP.  Using the Tingley

17   model, the Service predicted that in theory 98 pairs of BBWP could be supported on burned

18   habitat within the fire area.[3]  The Tingley model estimates that 43 BBWP pairs[4] could be

19   supported within the remaining burned ecosystem after the Project.[5]  (AR 350.)

20         The Assessment analyzed the cumulative impact on BBWP over the entire fire footprint,

21   which includes 31,324 acres of Forest land, and 8,200 acres of additional land, including 7,000

22   acres owned by the Bureau of Land Management, 500 acres of State, and 700 acres of private

23   

24   [3]      The Tingley model uses a dataset based on detailed satellite imagery and assumes BBWP home range varies
depending on the quality of the habitat.  (AR 342.)  This model estimates the number of potential BBWP pairs, but
25   does not predict actual numbers.  The Service uses it to identify the highest capability of the habitat and to compare
relative impacts of action and no-action alternatives.
26   [4]      Data indicates that the proposed action would reduce the habitats ability to support woodpeckers by
approximately 53% according to the Tingley model, retaining enough habitat to support about 43 Black-backed
27   Woodpecker pairs on USFS lands that were deferred from treatment (such as natural recovery and reforestation only
areas).  (AR 350.)
28   [5]      The Tingley model does not account for the 20 percent of land within each treatment unit that will be
designated as wildlife retention islands and remain untreated.  (EA 46.)

1   land.  (AR 242, 348.)  The fire created approximately 5,769 acres of BBWP preferred habitat,

2   3,646 acres of which would be subject to treatments under the Project.  (AR 505.)  The MIS

3   report includes a 2014 regional analysis, which found that from 2006 to 2013 wildfires created

4   approximately 180,823 acres of burned forest habitat on Forest land, of which 37,727 acres (21%)

5   had been, or were proposed to be, subject to post-fire treatments.  (AR 508.)  Taking account of

6   all lands as well as post-timber removal, the regional analysis determined that an estimated

7   168,761 acres of burned habitat suitable to BBWP was created over this seven year period.  In

8   May of 2015, the regional analysis was updated to account for 2014 fires (including the Bald and

9   Eiler fires).  Taking account of all lands as well as post-fire treatments, the regional analysis

10  determined that an estimated 223,017 acres of burned habitat was created over the 2007 to 2014

11  seven year period.  The Forest Supervisor considered the effect that reducing the number of snags

12  on 3,646 acres of burned forest habitat would have, and concluded that the loss of BBWP habitat

13  would not alter the existing trend in the Sierra Nevada bioregion.  (DN at 14; EA at 47.)

14      **II.      LEGAL STANDARDS**

15          A.      Injunctive Relief

16          "The standard for granting a temporary restraining order . . . is identical to that for a

17  preliminary injunction."  *Martin v. Litton Loan Servicing, LP*, No. 2:12-CV-970-MCE-EFB, 2012

18  WL 5833719, at *1 (E.D. Cal. Nov. 15, 2012); *cf. Stuhlbarg Int'l Sales Co. v. John D. Brush &*

19  *Co.*, 240 F.3d 832, 839 n. 7 (9th Cir.2001) (observing that an analysis of a preliminary injunction

20  is "substantially identical" to an analysis of a temporary restraining order).  Injunctive relief is

21  "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

22  entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing

23  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).  "The purpose of a preliminary

24  injunction is merely to preserve the relative positions of the parties until a trial on the merits can

25  be held."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Costa Mesa City*

26  *Employee's Assn. v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of

27  such an order is to preserve the status quo until a final determination following a trial.") (internal

28  quotation marks omitted).  However, preliminary injunction is not automatically denied simply

because the movant seeks to alter the status quo, but instead the movant must meet heightened scrutiny. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.* A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Simply put, Plaintiff must demonstrate, "that [if] serious questions going to the merits were raised [then] the balance of hardships [must] tip[ ] sharply in the plaintiff's favor," in order to succeed in a request for preliminary injunction. *Id.* at 1134–35.

B.    <u>Administrative Procedure Act</u>

The National Environmental Policy Act (NEPA) "is a purely procedural statute." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002). NEPA does not dictate particular results or require that agencies elevate environmental impacts over other concerns. Instead, NEPA provides a process to ensure that agencies take a "hard look" at the environmental consequences of their actions. *Id.* NEPA serves the dual purpose of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Agency compliance with NEPA is reviewed under the Administrative Procedure Act (APA). 5 U.S.C. §§ 701-706; *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1016 (9th Cir. 2012). Review is generally limited to the administrative record that was

1    before the agency at the time of its decision.  *Grand Canyon Trust*, 691 F.3d at 1016 n.10; *Sw.*

2    *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).  A court

3    may set aside an agency action only if it determines that the action was "arbitrary, capricious, an

4    abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This

5    standard of review is "highly deferential, presuming the agency action to be valid and affirming

6    the agency action if a reasonable basis exists for its decision."  *Nw. Ecosystem Alliance v. U.S.*

7    *Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quotation and citation omitted).

8           Courts must uphold a reasonable agency action "even if the administrative record contains

9    evidence for and against its decision."  *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024,

10   1036 (9th Cir. 2010) (quotation and citation omitted).  "The court's task is not to make its own

11   judgment," because "Congress has delegated that responsibility to the [agency]."  *River Runners*

12   *for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).  Instead, "[t]he court's

13   responsibility is narrower: to determine whether the [agency's action] comports with the

14   requirements of the APA . . . ."  *Id.*  The Ninth Circuit has held that "[t]he [agency's] action . . .

15   need only be a reasonable, not the best or most reasonable, decision."  *Id.* (quotation and citations

16   omitted).  The APA does not allow a reviewing court to overturn an agency decision because it

17   disagrees with the decision or with the agency's conclusions about environmental impacts.  *Id.*

18   This is especially true in the context of management of Service lands, for Congress has

19   consistently acknowledged that the Forest Service must balance competing demands in managing

20   National Forest System lands.  *See United States v. New Mexico*, 438 U.S. 696, 716 n.23 (1978).

21          **III.    ANALYSIS**

22          To succeed on Plaintiffs' motion, they must make a showing on all of the elements of the

23   *Winters* test.  *Alliance for the Wild Rockies*, 632 F.3d at 1135.  Thus, the Court addresses each

24   prong of the injunctive relief analysis in turn.

25          A.      Likelihood of Success on the Merits

26          Plaintiffs' NEPA challenge to the Project rests on the following three arguments: (1) the

27   BBWP cumulative effects analysis is arbitrary and capricious because it does not specifically

28   address impacts caused by the Eiler Project or timber harvest on private lands (ECF No. 10-4 at

7

1    13–14); (2) the Project may have a significant effect on BBWP and the Service is therefore

2    required to prepare an EIS (ECF No. 10-4 at 8); and (3) the Service failed to take a hard look at

3    impacts on BBWP (ECF No. 10-4 at 18).   For the reasons set forth below, the Court finds that the

4    Service carefully considered Project impacts—including cumulative impacts—on BBWP and

5    reasonably found no significant impact on BBWP.   In addressing Plaintiffs' first two arguments

6    below, it is clear that the Service took a hard look at the impacts that the Project will have on

7    BBWP.   Accordingly, the Court discusses this in conjunction with the second argument and

8    declines to separately address this argument.[6]

9                             *1.      The BBWP Cumulative Effects Analysis is Appropriate*

10              The Service used the perimeter of the Bald Fire, which includes 31,324 acres of Forest

11   and 8,200 acres of additional land, as the cumulative effects analysis area for BBWP.   (AR 348.)

12   Plaintiffs argue the analysis area is deficient because it does not include the Eiler Project, which is

13   nine miles away.   (AR 1531.)

14              NEPA requires that an agency proposing major federal action analyze the cumulative

15   effects of past, present, and reasonably foreseeable actions.   *See* 40 C.F.R. § 1508.7.   The

16   cumulative effects analysis requires "a reasonably thorough discussion of the significant aspects

17   of the probable environmental consequences."   *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343

18   (9th Cir. 1996) (citations omitted).   NEPA does not impose any particular geographic area or

19   timeframe on the cumulative effects analysis.   Instead, identifying the spatial and temporal scope

20   of the cumulative effects analysis is a task assigned to the special competency of the agency and

21   is given considerable deference by the courts.   *Kleppe v. Sierra Club*, 427 U.S. 390, 413–14

22   (1976); *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1030 (9th Cir. 2007) ("[W]e recognize

23   that the determination of the extent and effect of [cumulative effect] factors, and particularly

24   identification of the geographic area within which they may occur, is a task assigned to the

25   special competency of the appropriate agencies . . . .") (internal quotation and citation omitted);

26   *Neighbors of Cuddy Mountain*, 303 F.3d at 1071 ("under NEPA we defer to an agency's

27   determination of the scope of its cumulative effects review").

28   _____

    [6]     *See infra* Sections A(2)(b)–(c).

The Eiler Project is wholly outside the Bald Fire perimeter and is thus not part of the contiguous area of potential BBWP preferred habitat that the Bald Fire created.  In considering the distance that the Eiler Project is from the Bald Fire perimeter, the Court sees nothing arbitrary or capricious about the Service's decision not to include it in the cumulative effects analysis, nor have Plaintiffs demonstrated that the analysis area, the entire area burned in the Bald Fire, is arbitrary and capricious.  Furthermore, Plaintiffs' assertion that it should have been included because the Eiler Project is on the same ranger district (ECF No. 10-5 at 15), is of no biological relevance and is thus unavailing.

Plaintiffs suggest that cumulative effects analysis should have included the Eiler Project to address the potential for BBWP to move between the fire areas.  However, this assertion ignores the fact that BBWP also disperse in green forest.  (AR 3113, 3117.)  It also ignores the fact that BBWP appear to be able to disperse over large distances well beyond the Eiler Fire, although dispersal distances are not fully known.  (AR 3122.)  Thus, Plaintiffs' speculative claims of dispersal do not provide a valid basis for drawing a larger analysis area.  *See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 944 (9th Cir. 2014) (upholding agency's analysis area that excluded a neighboring project because it "has to draw a line somewhere and has offered a reasonable justification for why it drew the line where it did.").  Here, the Service reasonably drew a cumulative effects analysis area boundary that encompasses all land affected by the Bald Fire.  That determination is neither arbitrary nor capricious and is entitled to deference.  *See Cuddy Mountain*, 303 F.3d at 1071.  Moreover, the Court finds Plaintiffs' contention that the Service did not consider the effects of the Eiler Project to be incorrect.  (ECF No. 10-4 at 14.)  The Service considered the effects of the Eiler Project and other projects that potentially affect BBWP preferred habitat in its BBWP regional analysis. (*See* DN 1 ("The interdisciplinary team (IDT) used the LNF Bald Fire Rapid Assessment of Vegetation Condition after Wildfire (located in the Bald Project Record), the Burn Area Emergency Response (BAER) Report (Day, Bald, and Eiler Fires), records of burn patterns and intensities, and a review of land allocations to determine the purpose of and need for action in the project area following the fire."); AR 357–58, 763–66; EA at 47; DN at 14.)

1    Similarly, Plaintiffs claim the Service "offers no statements at all about cumulative effects

2  in the Lassen region, or any region."  (ECF No. 10-4 at 14.)  Again, the Court finds this claim is

3  incorrect.  The Service discussed impacts on BBWP across the Sierra Nevada in the Assessment,

4  the EA, and the Decision Notice:

5          This reduction of less than 4,000 acres of burned forest black-
           backed woodpecker habitat would not alter the existing trend in this
6          ecosystem component, nor would it lead to a change in the
           distribution of black-backed woodpecker across the Sierra Nevada
7          bioregion, given that from 2006 to 2013 wildfires created an
           estimated 168,761 acres of burned forest, black-backed woodpecker
8          habitat.

9  (EA at 47; DN at 14; *see also* AR 357–58.)  As such, Plaintiffs have not met their burden of

10 showing that the Service's cumulative analysis was inappropriate.

11          *2.*      *Because the Project Impacts Are Not Significant, an EIS is Not Required*

12          NEPA requires preparation of an Environmental Impact Statement (EIS) for "major

13 Federal actions significantly affecting the quality of the human environment."  42 U.S.C. §

14 4332(2)(C); 40 C.F.R. § 1508.9.  To determine whether an EIS is required, an agency may

15 prepare an Environmental Assessment ("EA").  *See* 40 C.F.R. § 1501.4; *Salmon River Concerned*

16 *Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994).  If, in the view of the environmental

17 assessment, the agency determines that its project will significantly affect the environment, then

18 an EIS must be prepared.  40 C.F.R. § 1501.4.

19          An EA is simply a "workable public document that briefly provides evidence and analysis

20 for an agency's finding regarding an environmental impact."  *Native Ecosystems Council v.*

21 *Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012) (quoting *Tri-Valley CAREs v. U.S. Dep't of Energy*,

22 671 F.3d 1113, 1129 (9th Cir. 2012)).  Courts apply a "rule of reason" in reviewing the adequacy

23 of an EA's discussion of possible environmental impacts.  *Klamath-Siskiyou Wildlands Ctr. v.*

24 *Bureau of Land Mgmt*., 387 F.3d 989, 992 (9th Cir. 2004).  Whether a Project's effects are

25 significant "requires consideration of context and intensity."  *Ctr. for Biological Diversity v. Nat'l*

26 *Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008).  If an agency determines

27 that a proposed action will not significantly affect the environment, it may issue a Finding of No

28 Significant Impact in lieu of preparing an EIS.  40 C.F.R. §§ 1501.4(e); 1508.13.

1   An EA must only "provide the public with sufficient environmental information,

2   considered in the totality of the circumstances, to permit members of the public to weigh in with

3   their views and thus inform the agency decision-making process." *Bering Strait Citizens for*

4   *Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).  An

5   agency need not "compile an exhaustive examination of each and every tangential event that

6   potentially could impact the local environment. Such a task is impossible, and never-ending."

7   *Native Ecosystems Council*, 697 F.3d at 1053; *see also* 40 C.F.R. § 1508.9; *League of Wilderness*

8   *Defenders v. Allen*, 615 F.3d 1122, 1136 (9th Cir. 2010) (finding that an EIS assessment of the

9   cumulative impact of Forest Service's proposed management and treatment activities was

10   sufficient even though it did not delve into details of individual past actions).  Once a reviewing

11   court is "satisfied that a proposing agency has taken a 'hard look' at a decision's environmental

12   consequences, [its] review is at an end." *Idaho Conservation League v. Mumma*, 956 F.2d 1508,

13   1519 (9th Cir. 1992) (citations and quotations omitted).

14   The Service considered context and intensity and determined that the Project would not

15   have a significant environmental impact and thus would not require an EIS.  (DN at 9.)  Plaintiffs

16   assert that four intensity factors codified at 40 C.F.R. § 1508.27(b)(4),(5) and (7)[7] support their

17   claim that the Project will have a significant impact.  (ECF No. 10-4 at 8–12.)  The Court

18   addresses each one of these factors in turn.

19   a.   The Degree to Which the Effects on the Quality of the Human

20   Environment are Not Likely to be Highly Controversial

21   The Ninth Circuit has held a plan is "controversial" if there is "a substantial dispute

22   [about] the size, nature, or effect of the major Federal action rather than the existence of

23   opposition to a use." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212

24   (9th Cir. 1998) (internal quotations omitted).  Plaintiffs first assert that the Bald Project is highly

25

26   [7]   Plaintiffs also seem to assert that 40 C.F.R. § 1508.27(b)(9) weighs in favor of requiring an EIS.  Section
(b)(9) states that in deciding whether a plan may have intense and thus significant impacts one must evaluate the

27   "degree to which the action may adversely affect an endangered or threatened species or its habitat that has been
determined to be critical under the Endangered Species Act of 1973."  As discussed in context of the other factors,
the Court finds that the BBWP is not an endangered or threatened species under the Endangered Species Act of 1973.

28   Thus, this factor is not relevant to the discussion at hand.

1    controversial because "the Forest Service is downplaying and wrongly minimizing the Project's

2    effect by misrepresenting the status of the woodpecker in the Sierra region." (ECF No. 10-4 at

3    11.) Specifically, Plaintiffs contend that a U.S. Fish and Wildlife Service's (FWS) 90-day finding

4    states that BBWPs in the Sierras are likely part of a distinct population (or subspecies) that is

5    separate from woodpeckers elsewhere in North America. (ECF No. 10-4 at 11 (citing AR at

6    3111).) Thus, Plaintiffs assert that BBWPs are inherently at much greater risk of loss than the

7    Forest Service acknowledges, and, therefore, there exists a substantial dispute about the size,

8    nature, or effect of the Bald Project. (ECF No. 10-4 at 11.)

9        In response, Defendants assert that Plaintiffs fail to acknowledge that this 90-day finding

10   merely initiates an administrative review process by the FWS, confers no special status on the

11   species, and is based on a lesser standard than the best available science standard required to

12   support any decision to list a species under the Endangered Species Act ("ESA").[8] (AR 490,

13   10501.) This Court agrees. Currently, BBWP is not identified as a species of high conservation

14   concern by the most important lists that make such designations. (AR 337.) This Court cannot

15   find that the Service's decision was "arbitrary, capricious, or an abuse of discretion" based on

16   speculation that the BBWP *may* be markedly separate from other woodpecker species.[9]

17       Second, Plaintiffs assert that the Project fails to follow the recommendations in the

18   Conservation Strategy[10] for the black-backed woodpecker (AR 3092), which further heightens the

19   controversial nature of the Project. (ECF No. 10-4 at 11.) Plaintiffs allege that the Service did

20   not follow BBWP Conservation Strategy recommendation by avoiding (1) clear cut harvesting of

21   areas greater than 6.18 acres, (2) harvesting during the May 1 – July 31 nesting season, and (3)

22   cutting snags for fuelwood in recent fire areas during the May 1 – July 31 nesting season. (ECF

23

24   [8]     In fact, Plaintiffs previously petitioned the California Fish and Game Commission seeking to have BBWP listed as threatened or endangered under California's version of the ESA. (*See* AR 1019.) After a comprehensive review, the Fish and Game Commission determined that listing was not warranted. (AR 336.)

25   [9]     *See* FWS Finding at AR 10495 ("We conclude that the petitioners have presented substantial information to indicate that black-backed woodpecker population segment in the Oregon Cascades and California may be markedly separated from other populations of the species, due to a combination of physical and ecological factors. Genetic data are presented as quantitative evidence of this separation.").

26

27   [10]    The Conservation Strategy is a summary of known information about the BBWP. It does not include requirements or prohibitions. "It is intended to provide a summary of the current science (2012) and recommendations related to black-backed woodpeckers that Forest Service and other managers can consider when developing specific projects to meet the project's purpose and need." (AR 4023.)

28

1  No. 10-4 at 11–12.)

2        As Plaintiffs acknowledge, the Conservation Strategy is not a binding document, but

3  rather a summary of known information about the BBWP and a set of management

4  recommendations for the BBWP.  In fact, the Conservation Strategy states that "the

5  recommendations in the strategy were designed with the knowledge that, at times, certain

6  management objectives are in tension, if not in direct conflict, with one another."  (AR 4023.)

7  Thus, the intent of Conservation Strategy is not that all recommendations be implemented on

8  every acre.  The BBWP is one species among many that the Service considered in designing the

9  Project and conducting its environmental analysis.  Moreover, despite Plaintiffs' protests, the

10  BBWP is of less concern than some of the other species at risk because it has been designated a

11  species of "Least Concern" due to its "extremely large range," stable population, and "extremely

12  large" population size.  (AR 337.)  The Service has attempted to strike a reasonable balance

13  between the goals of conserving burned forest habitat for BBWP and other species, and making

14  the Forest safe, recovering economic value from fire-killed trees reducing fuels and restoring

15  forested conditions.  (AR 340.)  In response to Conservation Strategy recommendations, the

16  Service dropped four units that the model indicated could potentially support a high density of

17  black-backed woodpecker pairs.  (AR 344.)  The Court finds that the Service's decisions were

18  informed and reasonable in light of the factual data in the record.  Thus, Plaintiffs have not met

19  their burden of showing that the Project is likely to result in highly controversial results.

20          b.    The Possible Effects are Neither Highly Uncertain nor Involve Unique or

21               Unknown Risks

22        BBWP is a species that is neither federally listed under the ESA nor designated as

23  "sensitive" by the Service.  However, Plaintiffs assert that in light of "the fact that black-backed

24  woodpeckers in the Sierra region have been identified for potential listing under the Endangered

25  Species Act, plainly there exists effects that could lead to unknown and possibly significant

26  impacts to the woodpeckers," and thus requires an EIS.  (ECF No. 10-4 at 10.)

27        First, the Court finds that the Project's impact on WWBP habitat is well-known and

28  carefully documented on the record.  The fire created 5,769 acres of burned habitat, 2,121 of

1    which will not be treated.  (AR 505.)  Twenty percent of each treatment unit will be designated as

2    wildlife retention islands and left untreated.  (EA 32.)   The Service utilized the Tingley model,

3    which estimated that 45 BBWP pairs could be supported within the remaining burned ecosystem

4    after the Project.  (AR 342.)  This number does not even account for the areas that will be left

5    untreated.  The proposed practices used during this Project are "routine in nature" and "their

6    effects are well known."  (DN at 15.)  Given the readily-available information, the Forest

7    Supervisor had ample reasons for concluding that the Project would not significantly impact

8    BBWP.  Therefore, the Court finds that the Service's decision was based on a consideration of the

9    relevant facts and its decision is owed deference.  *See Alaska Ctr. For Env't v. U.S. Forest Serv.*,

10   189 F.3d 851, 859 (9th Cir. 1999) ("To determine whether agency action is arbitrary or

11   capricious, a court must consider whether the decision was based on a consideration of the

12   relevant factors and whether there has been clear error of judgment.  Once the agency considers

13   the proper factors and makes a factual determination on whether the impacts are significant or

14   not, that decision implicates substantial agency expertise and is entitled to deference.") (internal

15   quotations and citations omitted); *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010,

16   1023 (9th Cir. 2012) (upholding salvage project EA that removed approximately half the black-

17   backed woodpecker habitat).  As such, Plaintiffs have not met their burden of showing that the

18   Project's effects are highly uncertain or involve unique or unknown risks.

19                      c.       The Service Considered the Beneficial and Adverse Impacts

20              In making its determination of significance, the Service considered both beneficial and

21   adverse effects, but did not rely on the Project's benefits to discount its negative effects.  (DN at

22   12.)  The EA candidly acknowledged adverse impacts, (EA at 23–74), and considered,

23   independent of the Project's beneficial effects, whether those impacts were potentially significant.

24   Plaintiffs allege that the Service "skews the analysis toward allegations of beneficial effects."

25   (ECF No. 10-4 at 12.)  The record makes clear that the Service concluded, after an open and

26   forthright analysis recognizing both beneficial and adverse effects, that the Project would have no

27   significant effects, thus not requiring an EIS.  As previously discussed, the Service's finding is

28   based on the Tingley model, as well as other scientific evidence detailed in its report.  Thus, this

1  Court cannot find that said finding is arbitrary or capricious.  *See Earth Island Inst.*, 697 F.3d at

2  1023 ("[B]ecause we do not agree that the alleged analytical failings of the Forest Service were

3  arbitrary and capricious, Plaintiffs have not demonstrated that the Forest Service's analysis

4  overall failed to take the required hard look under NEPA."); *see also Alaska Ctr. For Env't*, 189

5  F.3d at 859 (holding that once an agency makes a determination based on proper factors, the

6  decision implicates substantial agency expertise and is entitled to deference).  The Service's

7  finding of no significant impact is well-supported by the record.  Consequently, it is not required

8  to prepare an EIS.

9       Because the Court finds that Plaintiffs have failed to show a likelihood of success on their

10  claims concerning whether an EIS was required and the inappropriateness of the cumulative

11  effects analysis relied on by the Service, the Court finds that this factor weighs in favor of

12  denying Plaintiffs' motion.  The Court next turns to whether Plaintiffs have shown irreparable

13  harm.

14       B.       Irreparable Harm

15       To obtain emergency injunctive relief, Plaintiffs' must show that it is likely that they will

16  suffer substantial and immediate irreparable injury before a decision on the merits can be

17  rendered.  *Winter*, 555 U.S. at 22.  Plaintiffs assert three theories of irreparable harm: (1) that the

18  Project will preclude their members from using the Project area in an undisturbed state; (2) that

19  irreparable harm flows from a NEPA violation; and (3) that logging burned forest causes

20  irreparable harm.  (ECF No. 10-4 at 16–17.)  For the reasons set forth, this Court finds these

21  claims to be unavailing.

22       To establish harm, Plaintiffs rely on the declaration of Chad Hanson, who states that he

23  intends to visit the Project area to research post-fire succession and observe and study BBWP and

24  other avian species and enjoy large patches of unmanaged snag forest habitat.  (ECF No. 10-3 at ¶

25  9.)  Mr. Hanson states that the Project will harm his aesthetic and unspecified recreational

26  interests:

27       My research, recreational, and aesthetic interests will be harmed if
         the Bald Project is implemented because I will no longer be able to
28       pursue my research or recreational interests on the acres where

15

1

2

3

4

5

6

> logging, native shrub eradication/reduction, and artificial conifer plantation establishment are planned, because the species [the BBWP] that I study and observe strongly tend to avoid areas subjected to postfire logging, the shrub-nesting species that I study and observe strongly tend to avoid areas where shrubs have been removed, and because much if not most of the natural conifer regeneration will be killed by ground-based tractor logging.  Also, aesthetically, I find areas subjected to post-fire logging and montane chaparral eradication to be ugly—a sight of devastation that could not be more opposite to natural, unmanaged snag forest habitat, in my view.

7

8

(ECF No. 10-3 at ¶ 11.)  Mr. Hanson's declaration fails to describe a substantial and immediate

9

irreparable injury because he fails to show that his research cannot be conducted in areas where

10

logging will not be implemented.  Moreover, he fails to provide any indication regarding

11

irreparable harms to any other members of Plaintiffs' groups.  Plaintiffs also cite *Alliance for the*

12

*Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011), in support of their argument that the

13

Project is likely to cause irreparable harm.  In *Alliance for the Wild Rockies*, the plaintiffs alleged

14

that their members used the forest for work and a variety of specific recreational purposes "such

15

as hunting, fishing, hiking, horseback riding, and cross-country skiing."  632 F.3d. at 1135.  The

16

court found that the project would prevent the total use and enjoyment by members of 1,652 acres

17

of the forest.  *Id.*  In contrast, here Mr. Hanson's alleged harm to his interest in studying post fire

18

succession and BBWP in untreated snag forest habitat, unspecified recreational interests, and his

19

aesthetic opinion that post-fire logging is "ugly," does not establish likely irreparable harm.  As

20

already mentioned, the Court is unclear as to why Mr. Hanson cannot conduct his studies in other

21

areas where logging will not be commenced.  Moreover, this situation is distinguishable from

22

*Alliance for the Wild Rockies* because here the affected area cannot currently be used for

23

recreational purposes because the snags have created dangerous conditions that preclude such use.

24

Plaintiffs also assert that the Project would cause irreparable harm because it would result

25

in a NEPA violation.  (ECF No. 10-4 at 16–17.)  As discussed,[11] Plaintiffs have failed to show a

26

likelihood of success on their NEPA claim.  Thus, Plaintiffs have not met their burden of showing

27

that a likelihood of irreparable harm will result from their alleged NEPA violation.

28

---

[11] *See* Section III(A).

16

1    Lastly, Plaintiffs assert that logging in general causes a likelihood of irreparable harm.  In

2    support, Plaintiffs cite *League of Wilderness Defenders / Blue Mountain Biodiversity Project v.*

3    *Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014), for the premise that logging a forest causes

4    irreparable harm.  (ECF No. 10-4 at 16–17.)  Plaintiffs are correct that the Ninth Circuit has held

5    that harm caused by logging of mature trees cannot be remedied easily if at all, and thus is

6    "irreparable" for purposes of preliminary injunction analysis, even if the area had previously been

7    logged.  *League of Wilderness Defenders*, 752 F.3d at 764–65.  In that case, the court stated that

8    neither planting of new seedlings nor paying of money damages can normally remedy such

9    damage.  *Id.*  However, in *League of Wilderness Defenders*, the court was discussing the logging

10   of healthy mature trees.  In contrast, here, the Service is proposing to conduct salvage operations

11   of fire-killed trees.  Unlike the green timber at issue in *League of Wilderness Defenders*, fire-

12   killed trees are in a process of deterioration that, over time, will result in them breaking and

13   falling over.  Therefore, *League of Wilderness Defenders* is distinguishable from the instant case.

14   As a final note on this matter, the Court finds that Plaintiffs cannot show that the Project

15   will irreparably harm BBWP either.  Many species that presently exist within or near the project

16   area rely on live forests for their habitat needs. Without reforestation activities, some areas within

17   the Bald Fire will likely not re-establish as conifer forests or provide habitat for species that rely

18   on these forests for many decades.  (AR 464, 467, 471, 477.)  Site preparation and conifer tree

19   planting will be conducted in some of the areas that burned to re-establish forest cover in a timely

20   manner and to create a heterogeneous and species-rich forest landscape.  (AR 259, 469, 474,

21   480.)  While the Bald Project includes reforestation, it leaves a large portion (54 percent) of the

22   area burned in the Bald Fire to regenerate naturally.  (AR 240, 263.)  The Project leaves abundant

23   BBWP preferred habitat undisturbed.  Thus, the Court does not find that Plaintiffs have met their

24   burden of showing a likelihood of irreparable harm.

25   C.      Balance of the Equities

26   Because Plaintiffs have failed to show both a likelihood of success on the merits and

27   irreparable harm, this Court cannot find that the balance of equities weighs in favor of granting

28   injunctive relief.  *See Earth Island Inst. v. Carlton*, No. CIV. S-09-2020 FCD, 2009 WL 9084754,

17

1   at \*28 (E.D. Cal. Aug. 20, 2009) *aff'd*, 626 F.3d 462 (9th Cir. 2010) ("While the court must

2   seriously consider the potential harm to the environment caused by the Project, where plaintiff

3   has not made the requisite showing on the merits which, in turn, undermines the likelihood of

4   irreparable injury, the balance of equities cannot be found in plaintiff's favor.")  However, the

5   Court finds that even had Plaintiffs shown a likelihood of success or irreparable harm, this factor

6   still weighs in favor of denying injunctive relief.

7          Large numbers of standing dead trees, which can fall at any time, pose a serious safety

8   risk.  If hazard trees are not removed, most of the roads in the Project area will be too unsafe for

9   use by the general public or agency employees.  (EA 9, 28–29, 71, 74.)  Furthermore, closing the

10   roads is not an option due to the access they provide.  (DN 3, 7; EA 5, 24, 28, 68–69.)  Removing

11   hazard trees along roadsides and the rail line is essential for providing safe access to the area for

12   the public, Service employees, contractors, and adjacent land owners.  If salvage operations are

13   delayed, the severely burned areas will become increasingly occupied by fallen trees, broken tree

14   tops, and branches, with an increasingly heavy shrub component, creating conditions that increase

15   fuel loads while creating physical impediments that limit the ability of firefighters to control

16   future wildfires.  (AR 119.)  These conditions increase the risk of another high intensity fire.  (EA

17   30.)  The public safety concerns alone outweigh Plaintiffs' questionable injuries from the loss of a

18   small fraction of burned forest on the Project.

19          D.     The Public Interest

20          The public interest also favors denying the request for injunctive relief.  "The history of

21   equity jurisdiction is the history of regard for the public consequences in employing the

22   extraordinary remedy of the injunction."  *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496,

23   500 (1941).  When "exercising their sound discretion, courts of equity should pay particular

24   regard for the public consequences in employing the extraordinary remedy of injunction."

25   *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

26          The local community has suffered the devastating effects of the fire itself.  The Project

27   enables the Service to salvage some value from the burned timber, which will in turn provide an

28   estimated 360 jobs over time for project activities.  (AR 272–73.)  It will also provide safety to

1   Service employees, members of the community, and people who wish to recreate in the Forest.

2   The Project will help reduce the chance that a catastrophic fire will again threaten the community.

3        The National Forest Management Act requires the Service to manage Forest resources in a

4   manner that provides for multiple uses, including by maintaining "appropriate forest cover with

5   species of trees, degree of stocking rate of growth and conditions of stand designed to secure the

6   maximum benefits of multiple use sustained yield management in accordance with land

7   management plans." 16 U.S.C. § 1601(d)(1). The Project unquestionably serves several of the

8   management goals that Congress decided the Service should provide. The public interest favors

9   permitting the Service to do so. *See Earth Island Institute v. Carlton*, 626 F.3d 462, 475 (9th Cir.

10   2010) (holding that the district court did not err in considering economic factors and that salvage

11   logging was necessary to promote forest regeneration); *Friends of the Wild Swan v. Christiansen*,

12   955 F. Supp. 2d 1197, 1203 (D. Mont. 2013) (finding public interest weighed in favor of

13   defendants due to the "many negative effects a delay would have on the Project including

14   increased wildfire danger, loss of timber value, and the layoff of 120 employees at the sawmill

15   company servicing the Project"). Therefore, the Court finds that this factor also weighs in favor

16   of denying injunctive relief.

17       **IV.**   **CONCLUSION**

18        For the foregoing reasons, the Court finds that the *Winter* factors weigh in favor of

19   denying injunctive relief. As such, Plaintiffs' Motion for Temporary Restraining Order and/or

20   Preliminary Injunction (ECF No. 10) is hereby DENIED.

21        IT IS SO ORDERED.

22   Dated:  October 7, 2015

23

24

25                                    Troy L. Nunley
                                 United States District Judge

26

27

28